UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

------------------------------------------------------------- x
GARDABANI HOLDINGS B.V.  :
    Strawinskylaan 655  :
    Amsterdam, Netherlands  1077XX  :
  :
    and  :
  :
SILK ROAD HOLDINGS B.V.  :
    Strawinskylaan 655  :
    Amsterdam, Netherlands  1077XX  :
  :
          Petitioners,  :
  :  Case No. _____
  :
  - against -  :
  :
GEORGIA,  :
    7 Ingorokva Street,  :
    Tbilisi 0114, Georgia,  :
  :
          Respondent.  :
------------------------------------------------------------- x

**PETITION TO RECOGNIZE AND
ENFORCE AN ICSID ARBITRATION AWARD**

Petitioners Gardabani Holdings B.V. and Silk Road Holdings B.V. (collectively, "Petitioners"), by and through their attorneys, state as follows:

**INTRODUCTION**

By this action, Petitioners respectfully seek the recognition of an arbitration award pursuant to 22 U.S.C. § 1650a and Article 54 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, Mar. 18, 1965, 17 U.S.T. 1270, 575 U.N.T.S. 159 (the "ICSID Convention"). The final arbitration award (the "ICSID Award") was issued on October 27, 2022, in favor of Petitioners and against Respondent, the nation of Georgia ("Georgia"), following an arbitration (the "ICSID Arbitration") conducted under the auspices of

1

the International Centre for Settlement of Investment Disputes ("ICSID"), an arm of the World Bank.[1] In addition, Petitioners seek an order enforcing the pecuniary obligations imposed by the ICSID Award by an entry of judgment in Petitioners' favor and against Georgia in the full amount of the ICSID Award, including interest and costs as provided therein and with further interest to accrue pursuant to the ICSID Award until the date of payment in full, in addition to the costs of this proceeding.

A true and correct copy of the ICSID Award is attached as Exhibit A to the Declaration of Amir H. Toossi in support of Petitioners' Petition to Recognize and Enforce an ICSID Arbitration Award ("Toossi Declaration" or "Toossi Decl."), dated February 13, 2023.[1]

## PRELIMINARY STATEMENT

1.  Petitioners seek the recognition and enforcement of an arbitral award rendered against Georgia. After the collapse of the Soviet Union in the 1990s, the Georgian electricity sector transitioned from a state-owned system to a liberalized system, and Georgia sought to rehabilitate its energy sector by attracting investment. *See* Toossi Decl., Ex. A at ¶¶ 124, 125. Petitioners are investors in Georgia's energy sector, owning electricity generation companies, JSC Khrami-1 and JSC Khrami-2, and an electricity distribution company, JSC Telasi, respectively. *See id*. at ¶¶ 9, 10.

2.  Petitioners executed a series of tariff-setting agreements with Georgia over the course of roughly fifteen years. *See e.g., id*. at ¶¶ 3, 158. Georgia breached some of these agreements by adopting a new tariff-setting methodology in 2014, which ran contrary to the

---

[1] As discussed in more detail below, the ICSID Arbitration was conducted in parallel with another arbitration before the Arbitration Institute of the Stockholm Chamber of Commerce (the "SCC Arbitration"). Because the parties and issues in both arbitrations were similar, the parties requested that the same arbitration panel (the "Tribunal") oversee both proceedings. While the Tribunal ultimately issued awards in both arbitrations, and there is overlap in the two awards, Petitioners only seek confirmation of the ICSID Award in this forum. Moreover, Petitioners have undertaken not to seek double recovery to the extent that the two awards overlap.

agreements with Petitioners and impaired Petitioner's investments in the Georgian energy sector. *See e.g., id*. at 267, 294, 300. On August 4, 2017, Petitioners initiated ICSID arbitration proceedings against Georgia under the Agreement on Encouragement and Reciprocal Protection of Investments between Georgia and the Kingdom of the Netherlands which entered into force on April 1, 1999 (the "BIT" or "Treaty"). *See id.* at ¶ 25. On October 27, 2022, after a five-year arbitration, the Tribunal issued its decision finding that Georgia had, in fact, breached its agreements under the BIT. The Tribunal ordered that Georgia pay to Silk Road a sum of $48,427,000 and to Gardabani a sum of $27,499,000, amounting to $75,926,000 in total damages. *See id*. at ¶ 782. The Tribunal also ordered Georgia to pay interest on the Award accruing from December 24, 2021 until the date of payment in full. *Id.*

3.     Petitioners now seek this Court's recognition and enforcement of the ICSID Award.

**PARTIES**

4.     Gardabani Holdings B.V. ("Gardabani") is a private limited liability company established under the laws of the Netherlands. Gardabani owns 100% of JSC Khrami-1 ("Khrami-1") and JSC Khrami-2 ("Khrami-2") (collectively, the "Khrami Companies"), which are electricity generation companies incorporated in Georgia. Inter RAO UES, PJSC ("Inter RAO") is a Russian company which owns an indirect 100% interest in Gardabani.

5.     Silk Road Holdings B.V. ("Silk Road") is a private limited liability company established under the laws of the Netherlands. Silk Road owns 75.11% of JSC Telasi ("Telasi"), a joint stock electricity distribution company incorporated in Georgia. Inter RAO indirectly owns an 100% interest in Silk Road.

6.     Respondent is Georgia, a foreign State within the meaning of the Foreign Sovereign Immunities Act ("FSIA"). *See* 28 U.S.C. § 1603(a). On August 4, 2017, the date that

3

Petitioners initiated arbitration proceedings by filing a Request for Arbitration with ICSID, Georgia was and continues to be a party to the ICSID Convention.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1330(a), which provides that the United States District Courts shall have original subject matter jurisdiction over any nonjury civil action against a foreign State unless the foreign State is entitled to immunity under the FSIA or an applicable international agreement.

8. Georgia is not entitled to immunity here. Georgia has waived its immunity for purposes of this Petition by becoming a party to the ICSID Convention. *See* 28 U.S.C. § 1605(a)(1). In addition, Georgia is not entitled to immunity because this action seeks to recognize an arbitral award made pursuant to a treaty in force in the United States calling for the recognition and enforcement of arbitral awards—specifically, the ICSID Convention. *See* 28 U.S.C. § 1605(a)(6).

9. This Court also has subject matter jurisdiction over this action pursuant to 22 U.S.C. § 1650a(b), which provides that "[t]he district courts of the United States . . . shall have exclusive jurisdiction over actions" to enforce an ICSID award. The United States is a party to the ICSID Convention. The Federal Arbitration Act does not apply to this action. *See* 22 U.S.C. § 1650a(a).

10. This Court may exercise personal jurisdiction over Georgia pursuant to 28 U.S.C. § 1330(b), which provides that the United States District Courts have personal jurisdiction over a foreign State that—like Georgia in this action—is not entitled to immunity, provided that service of process is effected in accordance with 28 U.S.C. § 1608. Petitioners intend to serve process in a timely manner on Georgia pursuant to 28 U.S.C. § 1608(a), including, if required, through the

Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163.

11. Venue is proper in this district under 28 U.S.C. § 1391(f)(4), which provides that a party may bring a civil action against a foreign State in the United States District Court for the District of Columbia.

## THE DISPUTE AND THE AWARD

12. Petitioners, through their wholly or majority-owned subsidiaries, were participants in the Georgian energy sector, specifically operating in electricity generation and distribution. Toossi Decl., Ex. A at ¶ 9. Georgia's energy sector is subject to a series of tariffs, and during Petitioner's operations in Georgia, the Georgian government entered into several written agreements that stipulated the tariffs for which Petitioners were responsible. *See id.* at ¶¶ 3, 58. When Georgia breached these agreements and imposed tariffs inconsistent with its agreements, it violated both contractual and treaty law, and Petitioners initiated a claim with ICSID. Ultimately, after a five-year arbitration, the three-arbitrator panel found that Georgia had, in fact, violated its agreements with Petitioners and ordered Georgia to pay damages in the amount of $48,427,000 to Silk Road and $27,499,000 to Gardabani, as well as interest to accrue from December 24, 2021 until the date of payment in full. *See id.* at ¶ 782.

**Description of Georgian Tariff System**

13. After the collapse of the Soviet Union, the Georgia electricity sector transitioned from a state-owned system to a liberalized system, separating different electricity-related activities, including transmission, distribution, and generation. *See id.* at ¶ 124. Although a new legal and regulatory framework was established, shortages were still common. *Id.* Among Georgia's early efforts to modernize included selling a majority share of Telasi and transferring the management of the Khrami Companies to private companies, as well as bringing in other

5

foreign companies to manage transmission as well as wholesale electricity market operators. *See id.* at ¶ 125. Despite these efforts to privatize the electricity market, power outages were still commonplace, and Georgia needed to continue to rehabilitate its state-owned electricity generation, transmission, and distribution assets by attracting further investment. *Id*.

14. The 1999 Law on Electricity and Natural Gas allocated the ownership, commercial and regulatory functions in the power sector between the Ministry of Energy (the "MOE") and what would later become the Georgian National Energy and Water Supply Regulatory Commission (the "NERC"). *See id*. at ¶ 126. The MOE develops national policy in the energy sector and promotes investments in that sector, and the NERC has the exclusive competence to adopt tariff-setting methodologies and set tariffs in accordance with those methodologies. *See id*. at ¶¶ 127, 128. In addition to overseeing the tariffs that distribution companies can charge, controlling the issuance of generation and distribution licenses, and setting the fees for connecting new users to the distribution network, the NERC also produces an annual energy plan of how much energy each distribution company (and since July 1, 2021, each energy supply company) will acquire from each generator on a month-to-month basis over the course of a year. *See id.* at ¶ 132.

15. During the period of time relevant to the dispute discussed below, the NERC regulated energy tariffs, including:

- The Generation Tariffs, which cover generation, operating costs, capital expenditures of an energy generation company, plus profit. *Id.* at ¶ 139.

- The Consumer Tariffs, which are the rates that a distribution company can charge to its customers, and which form the revenue of distribution company's business. *Id.* at ¶¶ 140−141.

- The Weighted Average Purchase Tariff, which is a distribution company's weighted average annual cost per kilo watt hour of purchasing energy from generation companies. *Id.* at ¶¶ 140, 142.

6

- The Distribution Tariffs, which are the difference between the amount the distributor pays to acquire electricity it is going to distribute and the amount it charges customer, to profit. *Id.* at ¶¶ 140, 143.

The NERC guidelines, which are updated periodically, outline the methodology for calculation of the tariffs. *See id.* at ¶ 147.

**Background of the Dispute**

16. In 2003, pursuant to a sale and purchase agreement, Inter RAO made a significant investment in Georgia's energy sector, acquiring, among other investments, a 75% indirect interest in Telasi, the shares of a company with management rights for the Khrami Companies, and shares of Gardabani. Toossi Decl., Ex. A at ¶ 153. After Inter RAO's acquisition of Telasi in 2003, the tariff related arrangements between the Government and the Petitioners were modified several times by the Memoranda concluded in 2007, 2010, 2011, 2012 and, finally, 2013 (the "2013 Memorandum"). *Id.* at ¶ 158. These tariff agreements involved a combination of fixed tariffs and guaranteed tariff adjustments to compensate for factors such as inflation and depreciation of the Georgian national currency. *See id.* at ¶¶ 166, 169. The NERC implemented resolutions in accordance with the Memoranda. *See e.g., id.* at ¶¶ 180, 202, 238. Inter RAO, through its subsidiary Gardabani, purchased the Khrami Companies and executed the Khrami Sales Purchase Agreement (the "Khrami SPA") in 2011. *Id.* at ¶ 199. Pursuant to the 2013 Memorandum, which superseded any previous memoranda in their entirety, the NERC issued a resolution establishing Telasi's tariffs until December 31, 2025 at identical rates to those set out in the 2013 Memorandum. *See id.* at ¶¶ 534, 242.

17. Subsequently, in 2014, however, Georgia adopted a new methodology for regulating tariff-setting (the "2014 Methodology"), which were contrary to the negotiated tariffs in the 2013 Memorandum and did not include the agreed upon tariff adjustments. *See id.* at ¶ 300. As a result, in 2015, the NERC established Telasi's new Consumer and Distribution Tariffs

7

using the 2014 Methodology, which were different from those stipulated in the 2013 Memorandum. *Id.*

18. Similarly, the Khrami SPA, signed by Gardabani and Georgia, provided for fixed long-term Generation Tariffs and tariff adjustments for the Khrami Companies, which replicated the relevant tariff related agreements provided for in the 2011 Memorandum. *See id*. at ¶ 199. For example, the Khrami SPA provided for an agreed fixed increase of the Khrami Companies' tariffs but also for further upward adjustments of the tariffs triggered by devaluation of the Georgian currency against foreign currencies, such as the Japanese Yen and US Dollar. *See id.* at ¶¶199, 346−347. In the event Georgia failed to implement the Khrami SPA, Georgia was obligated to indemnify Gardabani for the consequences of failing to do so. *See id*. at ¶ 201. However, from 2015 to 2017, NERC refused to comply with Generation Tariff increases to offset any currency devaluation or provide adequate compensation. *See generally id.* at ¶¶ 341−377.

19. On July 1, 2021, Georgia implemented a policy of "unbundling" the energy distribution business, which segregated energy supply (*i.e.* energy purchase and resale) and distribution. *Id.* at ¶ 382. This "unbundling" policy had the effect of changing the tariff structure, which further varied from the agreed-upon tariffs in the 2013 Memorandum. *Id.* Telasi continued as an energy distribution company (operating the network and charging the Distribution Tariffs which no longer included profits from energy purchases and sale) while a newly established company, Telmiko LLC, took over the energy purchase and sale operations, charging a regulated profit margin over its energy purchase costs. *Id.*

**The ICSID Arbitration**

20. As a result of Georgia's actions affecting the Petitioners' investments in Georgia's electricity sector, which were governed by successive tariff-setting agreements,

Petitioners advanced several claims before the ICSID tribunal. Petitioners claimed, *inter alia*, that Georgia had violated both contractual and treaty law and had impaired their investments in contravention of Article 3(1) of the BIT by unreasonably failing to ensure that the tariffs applicable to Telasi and the Khrami Companies were set and adjusted as provided for in the 2013 Memorandum and the Khrami SPA. *See* Toossi Decl., Ex. A at ¶ 471. By insisting on the application of the 2014 Methodology and failing to identify any rational purpose for its conduct, Georgia acted unreasonably and arbitrarily and impaired the Petitioners' investments. *Id.*

21. On June 9, 2017, before the Arbitration Institute of the Stockholm Chamber of Commerce ("SCC"), Inter RAO, Telasi, and Gardabani (the "SCC Claimants") initiated an arbitration ("SCC Arbitration") against the Government of Georgia generally, the Georgia Ministry of Economy and Sustainable Development in Georgia, and the State Service Bureau. *Id.* at ¶ 459.

22. On August 4, 2017, ICSID received a request for arbitration from Gardabani and Silk Road Holdings against Georgia (the "ICSID Arbitration"). *Id*. at ¶ 25. On February 14, 2018, the Parties submitted a joint request to the SCC for the arbitration to be coordinated with the ICSID Arbitration such that both proceedings would be arbitrated by the same panel (the "Tribunal"). *Id.* at ¶¶ 31, 463.

23. The parties agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one to be appointed by each party and the third, presiding arbitrator to be appointed by agreement of the two arbitrators. *Id*. at ¶ 27. The co-arbitrators subsequently proposed, and the Parties agreed on November 30, 2017, to the selection of presiding arbitrator pursuant to a list procedure administered by the co-arbitrators with the assistance of the ICSID Secretariat. *Id*. at ¶ 28.

24. The Tribunal was originally composed of Mr. Henri C. Alvarez KC, a national of Canada, President, appointed by agreement of his co-arbitrators and pursuant to a list procedure; Professor Horacio Grigera Naón, a national of the Argentine Republic, appointed by the Petitioners; and Professor Zachary Douglas KC, a national of Australia, appointed by the Respondent. *Id*. at ¶ 29. Pursuant to the Parties' agreement to have the same Tribunal adjudicate both the ICSID Arbitration and the SCC Arbitration, Professor Horacio Grigera Naón's resigned, and Professor Stanimir Alexandrov was appointed to replace him. *Id.* at ¶¶ 33−34.

25. The ensuing arbitration was conducted in accordance with the ICSID Arbitration Rules in force as of April 10, 2006. *Id.* at ¶ 37. A hearing on the merits for both the ICSID and SCC proceedings was held in Paris from October 14, 2019 through October 24, 2019. Both sides were represented by counsel. Georgia was represented throughout the ICSID Arbitration and the SCC Arbitration by White & Case LLP.

26. On September 9, 2022, the Tribunal issued a final award in the SCC Arbitration ("Final SCC Award").[2] *Id.* at ¶ 122. The Final SCC Award determined damages owed to Telasi from the period of July 1, 2021 to December 31, 2025 and awarded compensation to Gardabani and Telasi for breach of the Khrami SPA and 2013 Memorandum. *Id.* The Final SCC Award required Georgia to pay to Gardabani a sum of $27,499,000 and to pay Telasi a sum of $84,500,000, a total amount of $111,999,000. The Final SCC Award also ordered Georgia to pay interest on the amounts awarded at the six-month USD SOFR rate plus 2% from December 24, 2021 until payment was made in full.

27. The ICSID Arbitration was closed on September 27, 2022. *Id*. at ¶ 123. On October 27, 2022, the Secretary-General of ICSID dispatched the Tribunal's Award (the "ICSID

---

[2] The Tribunal issued several partial awards to resolve certain issues, and the partial awards were ultimately resolved in the Final SCC Award.

Award"), finding that Georgia had violated Article 3(4) of the BIT, both based on obligations under the 2013 Memorandum and Khrami SPA. *Id.* at ¶ 782. The Tribunal awarded Petitioners monetary damages (plus pre-award interest) in the amount of $48,427,000 to Silk Road and $27,499,000 to Gardabani, amounting to $75,926,000 in total damages, together with simple interest on the amounts awarded at the six-month USD SOFR rate plus 2% from December 24, 2021 until payment was made in full. *Id.* Finally, the parties would share equally the costs of the Arbitration and bear their own legal costs and other expenses. *Id.*

28. The Tribunal found that the Petitioners' ICSID claims were admissible despite the award granted in the SCC Arbitration. *Id.* at ¶ 457. However, the amounts awarded were subject to any payments made by Georgia to the SCC Claimants and Petitioner's express undertaking not to seek double compensation. *Id*. at ¶ 782. Should Georgia make any payments towards the SCC Final Award, Petitioners will promptly notify the Court and indicate how, if at all, such payment affects the ICSID Award.

29. Petitioners are seeking recognition and enforcement of the ICSID Award concurrently in the Republic of Cyprus and the United Arab Emirates. *See* Toossi Decl. at ¶ 16. Should the ICSID Award be recognized and enforced in those jurisdictions, Petitioners will promptly notify the Court of such recognition, as well as any collections towards the ICSID Award.

## LEGAL BASIS FOR RELIEF

30. Article 54(1) of the ICSID Convention requires Contracting States to "recognize an award rendered pursuant to [the] Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State." Toossi Decl., Ex. B, at Art. 54(1).

31. To fulfill this obligation, the United States passed implementing legislation that provides:

> An award of an arbitral tribunal rendered pursuant to chapter IV of the [ICSID] convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. § 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the [ICSID] convention.

22 U.S.C. § 1650a(a).

32. The ICSID Convention prevents parties to an ICSID arbitration from challenging an ICSID award in court. *See* Toossi Decl., Ex. B, Art. 53(1). Accordingly, Georgia may not collaterally attack the ICSID Award in this proceeding. Thus, because the arbitration was conducted pursuant to the ICSID Convention, Georgia's only opportunity to challenge the Award is through the ICSID annulment process. Georgia has 120 days from the issuance of the Award to file an application for annulment with ICSID. *Id.* at Art. 52(2). As of the date of this filing, Georgia has not done so.

33. The Court should accordingly recognize and enforce the ICSID Award.

## THE AWARD MUST BE RECOGNIZED AND ENFORCED

34. Petitioners restate and incorporate Paragraphs 1 through 32 as if set forth fully herein.

35. The ICSID Award, a binding arbitration award under the ICSID Convention, has been issued in Petitioners' favor.

36. Awards issued pursuant to the ICSID Convention are subject to recognition and enforcement in the United States pursuant to 22 U.S.C. § 1650a.

37. Petitioners are thus entitled to an order recognizing the ICSID Award as a judgment pursuant to 22 U.S.C. § 1650a and Article 54 of the ICSID Convention, and enforcing

the pecuniary obligations imposed by the Award by entering judgment thereon in the full amount of the ICSID Award, with ongoing interest to accrue pursuant to paragraph 782 of the ICSID Award until the ICSID Award is paid in full, in addition to the costs awarded by the Tribunal and the costs of this proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners pray that the Court enter an Order:

a. Recognizing and enforcing the ICSID Award as a judgment of this Court, pursuant to 22 U.S.C. § 1650a and Article 54 of the ICSID Convention;

b. Entering judgment in favor of Petitioners and against Georgia in the amount of the full value of the ICSID Award, i.e., (i) damages awarded by the arbitral tribunal in the amount of US$ 75,926,000; and (ii) ongoing interest as provided by the arbitral tribunal, accruing from December 24, 2021 until the date of payment in full;

c. Ordering Georgia to pay the costs of this proceeding; and

d. Granting Petitioners such other and further relief as the Court deems just and proper.

Dated: February 13, 2023
New York, New York

Respectfully submitted,

_/s/ Farhad Alavi_
Farhad Alavi
(D.C. Bar No. 500560)
Akrivis Law Group, PLLC
5335 Wisconsin Avenue, NW
Suite 440
Washington, DC 20015
Email: falavi@akrivislaw.com
Telephone: (202) 730-1271

>Amir H. Toossi
>Admitted *Pro Hac Vice (pending)*
>Akrivis Law Group, PLLC
>747 Third Avenue, 32nd Floor
>New York, NY 10022
>Email: atoossi@akrivislaw.com
>Telephone: (646) 517-0687
>*Counsel for Petitioners Gardabani Holdings B.V. and Silk Road Holdings B.V.*